FILED
2013 Jun-04  PM 01:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **BRIDGETTE BURGIN,** | ) | |
| **PLAINTIFF,** | ) | |
| **VS.** | ) | **2:11-cv-753-JHH** |
| **BURLINGTON COAT FACTORY,** | ) | |
| **DEFENDANT.** | ) | |

## MEMORANDUM OF DECISION

The court has before it the May 1, 2012 Motion (Doc. # 56) of Defendant Burlington Coat Factory for summary judgment.  Pursuant to the court's August 20, 2012 and October 23, 2012 orders (Docs. # 71, 72 & 75), the Motion was deemed submitted, without oral argument, on November 5, 2012.  After careful review of the briefs and admissible evidence, the court concludes that the Motion (Doc. #56) is due to be granted in full for the following reasons.

## I. Procedural History

### A.  Extensive History of the Case

Plaintiff, through counsel, filed a Complaint on February 23, 2011 alleging claims of race and age discrimination and retaliation in violation of Title VII of the

Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 1981, and 29 U.S.C. § 621 (ADEA). (Doc. # 1.)  On May 17, 2011, four days after perfecting service, counsel for Plaintiff filed a motion to withdraw, citing "differences of opinion on how the case should or should not proceed" and stating that those "differences have and will make it difficult for counsel to continue representation on the plaintiff in this case."  (Doc. # 5.)  The court took the motion under advisement and gave Plaintiff the opportunity to show cause why by May 27, 2011 permission to withdraw should not be granted.  (Doc. # 7.)  That order also informed Plaintiff of her responsibilities as a <u>pro se</u> litigant in this court, including the following requirements:  (1) that communication with the court must be through filings only; (2) that all filings must contain the certificate of service (an example of which was set out in the order); and (3) a reminder to mail all filings to counsel for all parties.  (<u>Id.</u>)  After no response from Plaintiff by the date allotted in the order,[1] on June 1, 2011, the court granted the motion to withdraw, (Doc. # 8) and Plaintiff has proceeded <u>pro se</u> since that date.

Defendant filed its Answer (Doc. #9) to the Complaint on June 2, 2011, and the court issued its usual order (Doc. # 11), reminding the parties of their obligations

---

[1] As became the pattern in this case, the court received an undated letter from Plaintiff on June 10, 2011, fourteen (14) days after the date stated by the court, consenting to the motion to withdraw stating that it was her "desire to seek new counsel regarding the communication and application of evidence."  (Doc. # 12.)

2

under Federal Rule of Civil Procedure 26.  Then, on July 25, 2011, Burgin filed her first motion for recusal, stating that she did "not believe that she will receive a fair and impartial trial, or hearing from this Court" because of her experience in another case and sought the appointment of a mediator.  (Doc. # 13.)  The court denied the motion, assuring the Plaintiff that it would be fair and unbiased and stated that it welcomed a motion for mediation if Defendant agreed.  (Doc. #14.)

After this order, the court did not hear anything from the parties until November 22, 2011, when Plaintiff filed a letter motion, dated November 17, 2011, (Doc. #20) for extension of time within which to respond to Defendant's Request for Production.  She requested a large extension of 72 days - until January 31, 2012.[2] The court denied the request (Doc. #21) and reminded Plaintiff of the requirements of communication with the court.  The court stated that it could not continue to accept letters or documents without the required certificate and such filings may be struck in the future.  (Id.)  Although the court denied the extension, Defendant agreed to a thirty-day extension.  (Doc. # 26 ¶ 4.)  Plaintiff filed her Response[3] (Doc. # 22) to the outstanding discovery on December 27, 2011.

---

[2] The discovery requests were served on October 20, 2011, and under the Rules of Civil Procedure her deadline for response was November 21, 2011.  (See doc. # 26.)

[3] The Response consisted of a cursory response to the document requests, but did not include any response to the interrogatories.

Then, on February 7, 2012, Defendant filed a Motion (Doc. #26) to Compel Complete Responses to Discovery Requests, after multiple attempts to resolve the issue without involvement of the court.[4]  The Motion also requested an order from the court compelling Plaintiff to attend her deposition, as noticed, on February 23, 2012. (Id.)  The following day, the court granted (Doc. #27) the motion and ordered Plaintiff to (1) provide complete, verified responses to the interrogatories, without objection, by February 20, 2012; (2) conduct a diligent search for responsive documents, supplement her answers to the request for production, or state that no such documents exist by February 20, 2012; and (3) appear at her deposition as noticed.  (Id.)  Further the court warned that failure to comply with the court's order could result in a motion to dismiss for lack of prosecution under Federal Rule of Civil Procedure 41(b).  (Id.)  Plaintiff filed her third set of responses on February 10, 2012, (Doc. # 28) and appeared for her deposition.

Almost one month later, on March 6, 2012, Defendant filed its Second Motion (Doc. #37) to Compel Responses to Discovery Requests.  The motion also sought Plaintiff's signature on a HIPPA release for her medical records relating to her claims of emotional, physical and/or psychological harm allegedly caused by Defendant.

---

[4]Plaintiff did supplement her discovery response, but provided answers to only 4 of the 21 interrogatories.  The remaining responses were objections or unclear references to her previous responses.

(Id.)  Before ruling on the motion, the court reviewed the history of the case, to date, and highlighted much of the above, including specific details relating to Plaintiff's attempts at responding to the outstanding discovery and her testimony regarding alleged medical treatment received as a result of harm allegedly caused by Defendant. (Doc. # 38.)  In light of that history, the court agreed with Defendant that Plaintiff had not followed the court's February 8, 2012 order regarding the written discovery.  (Id.) The court, therefore, granted the motion and ordered Plaintiff to provide the following[5]: (1) complete, verified responses to the interrogatories, without objection, by March 16, 2012; (2) supplemental and complete answers[6] to the request for production of documents and produce all responsive documents by March 16, 2012; and (3) by March 16, 2012 either (a) identify all medical providers and treatments, produce related and supporting documents and sign a HIPPA release or (b) file an acknowledgment with the court that she is not seeking any damages for emotional distress or any other damages related to any claimed physical injuries or medical treatments allegedly caused by Defendant.  (Id.)

     The day after the court entered the discovery order, on March 14, 2012,

---

[5] The court used such a short deadline for response because discovery ended on March 16, 2012.  Additionally, the court had already ordered Plaintiff to provide responses to the first two issues, which had been due on February 20, 2012.

[6] The court specified that the answers should specifically reference which documents respond to which requests.  (Doc. #38.)

5

Plaintiff filed a Motion to Amend/Correct her Complaint.  (Doc. #39.)  The motion sought to "add[] new information, and includes the Disability of the Plaintiff, not documented in the first complaint."[7]  (Id.)    In ruling on the motion, the court cited to the June 8, 2011 reminder order (Doc. #11) that stated "the parties to the litigation and the issues embraced in the litigation shall be reflected by the pleadings on file 120 days after the action was commenced."  (Id.)  As this case was then over a year old (filed on February 23, 2011),[8] the court denied the motion to amend her complaint to add a new claim.  (Id.)

While the motion to amend was pending, each party filed a document with the court.  First, on March 21, 2012, Defendant filed a Motion (Doc. #41) to Dismiss for Lack of Prosecution.  Second, on March 26, 2012, Plaintiff filed a Response (Doc. #44) to the court's discovery order (Doc. #38).  In that response, Plaintiff stated that she did not receive the court's order until March 18, 2012, two days after the deadline in the order.[9]  (Doc. #44 at 1.)  The response detailed Plaintiff's frustration regarding

---

[7] The Motion also alleged that Defendant did not return a document to Plaintiff, and that Plaintiff has evidence that an employee of Defendant destroyed and/or tampered with evidence related to this case.  (Id. at 1-3.)  The motion was not clear as to what claims Plaintiff wanted to add regarding that information.

[8] Additionally, under the Scheduling Order, the discovery deadline was March 16, 2012.

[9] The order was mailed to Plaintiff the same day it was entered, on March 13, 2012. Plaintiff's mailing address is a post office box in Woodstock, Georgia.

6

working with Defendant on the outstanding discovery requests,[10] and again requested that the court rule on her motion to amend, which she attached.  (Id.)

On March 27, 2012, the court took Defendant's Motion (Doc. #41) to Dismiss for Lack of Prosecution under advisement and set a briefing schedule.  (Doc. #43.) The briefing schedule gave Plaintiff four (4) weeks to file her opposition to the motion and allowed Defendant one (1) week to reply to Plaintiff's opposition.  (Id.) On April 2, 2012, Plaintiff filed a Motion (Doc. #45) for Extension of Time To Respond.  The Motion sought "an extension of at least thirty (30) days from the date of March 31, 2012" to respond to the Motion to Dismiss.  (Id.)  The motion attached her "Amended Complaint," detailed her continued struggles with correcting her deposition, and discussed some alleged discovery that she claimed was not answered by Defendant.  (Id.)

On April 4, 2012, the court denied (Doc. # 46) Plaintiff's request for more time to respond to the motion to dismiss, stating that a full four weeks was more than adequate time to respond.  In addition, the court reminded Plaintiff that it denied her motion to amend her complaint and that the only claims before the court were the ones filed in her original complaint.  (Id.)  Finally, the court stated that it could not

---

[10] Plaintiff characterized these discovery difficulties as "harassment" by the Defense. (Doc. #44 at 2.)  She also insisted that the Defendants were "intentionally deceiving" the court regarding the situation.  (Id. at 3.)

make an informed decision regarding the amendments to her deposition and the alleged discovery dispute as it did not have enough information regarding the issues to rule.  (Id.)

Obviously displeased with the court, on April 13, 2012, Plaintiff filed a Second Motion for Recusal or Disqualification.  (Doc. # 47.)  Stated reasons for such recusal included: (1) the court's "extreme bias in this case against disabled persons"; (2) the court's "personal disdain for the Plaintiff Burgin, who is Pro Se"; and (3) that "Judge Hancock has stated in Orders to the Plaintiff that the judge is unable to understand or interpret and reasonably conceive of what the Plaintiff is asking in her motions to the court."  (Id.)  On April 17, 2012, the court denied (Doc. # 48) the motion to recuse.

On April 26, 2012,[11] Plaintiff filed her Opposition (Doc. #51) to Defendant's Motion to Dismiss, and also titled the document as a Motion for Summary Judgment.[12]  She also filed an affidavit in support of her opposition.  (Doc. #52.)  In addition, Plaintiff filed yet another Response (Doc. #53) to Defendant's Request for

---

[11] Plaintiff's Opposition was due on April 24, 2012.  (Doc. # 46.)  On April 26, 2012, the court received a Notice of Timely Submission stating that "Plaintiff has timely filed her response on April 23, 2012, by Email, to the Defense Attorney in this case . . . .  The Plaintiff has submitted this filing to the Court, on today, April 24, 2012."  (Doc. # 49.)

[12] That same day, Plaintiff filed a Notice (Doc. #50) of intent to file "a complaint with the Judicial Inquiry Committee" regarding the court's refusal to recuse.

8

Production, which were ordered answered originally by February 20, 2012 and again by March 16, 2012.[13]  (See Docs. # 27, 38.)  Defendant timely filed its reply (Doc. #54) to Plaintiff's opposition to the Motion to Dismiss on May 1, 2012.  Defendant also filed a Motion (Doc. #56) for Summary Judgment on May 1, 2012.

After reading the briefs filed on the Motion to Dismiss, the court took up an evidentiary issue raised in Plaintiff's Opposition - specifically Plaintiff argued that her deposition was inadmissible.  (See Doc. #51.)  Plaintiff provided the stenographer service that transcribed her deposition testimony with a copy of her original transcript with handwritten revisions, made mainly in red ink, to an extremely large portion of her testimony, along with a signed and notarized statement of her reasons for the changes.  (See Exh. D to Doc. # 54.)  The court, therefore, considered Plaintiff's argument, the changes and signed statement of reasons in combination and viewed them as a Motion to Strike portions of her deposition testimony and substitute the handwritten portions of her new testimony.  (Doc. #58.)

After consideration of the argument of the parties and the applicable law, the

---

[13] On May 7, 2012, without any explanation as to what the documents were, Plaintiff filed ten (10) pages of mobile phone records with dates from 8/29/11, 8/30/11, 4/24/12, 7/8/11, 6/29/11, 1/27/12-2/1/12, 2/14/12, 8/1/11, 8/18/11, 8/19/11.  (Doc. #57.)  There was no cover page with the documents, but merely a hand-written case name and number on the right-hand corner of the top page of phone records.  (Id.)  The court remains baffled by this filing, but assumes that Plaintiff believes them to be responsive to Defendant's Request for Production.

court gave Plaintiff a choice.  (Id.)  She could choose for the court to either (1) use the original, unaltered deposition testimony or (2) allow the changes, but also allow the reopening of Plaintiff's deposition, with questions limited in scope to the changes. (Id.)  If Plaintiff chose the second option, the court stated that Plaintiff would be responsible for the costs and attorney's fees associated with the reopening of her deposition.  (Id.)  The court directed Plaintiff to alert the court of her decision by May 25, 2012.[14]  (Id.)

On May 29, 2012,[15] Plaintiff filed a document entitled "Answer to the Court's Order and Motion for a Directed Verdict and Motion to Dismiss Defense Summary Judgment for Failure to Prosecute."  (Doc. # 60.)  That same day, she also filed a "Renewed Motion for Summary Judgment Against Defense and Renewed Motion in Opposition to the Defense Motion to Dismiss and Motion against Countclaim [sic] of Defense Summary Judgment."  (Doc. #61.)  The first document was comprised of three main arguments: (1) a statement of facts and summary of argument in support

---

[14] Because there had been some issues with Plaintiff timely receiving orders from the court, the court directed the clerk to send a copy of this order by certified mail, return receipt requested.  (Doc. #58.)  The order was received and signed for by Plaintiff on May 14, 2012.

[15] That same day, the court received a letter from Plaintiff regarding the "poor quality" and "condition of the documents" sent by counsel for Defendant regarding her "amended deposition."  (Doc. #59.)  The apparent purpose was for the court to "see the difference in quality" between the documents Plaintiff had and the documents counsel for Defendant sent to Plaintiff.  (Id.)

of summary judgment; (2) argument regarding "prejudicial stenographers statements"; and (3) an extensive argument regarding her deposition testimony and the court's order surrounding the issue. (Id. at 60.) The second document is a thirty-five (35) page response to Defendant's Motion to Dismiss for failure to prosecute, as well as an argument for summary judgment, and includes prayers for relief as well as a new trial. (Doc. #61.) The document also contained discussions regarding alleged "slander and libelous claims by defense" (id. at 3-6), other alleged malicious conduct of counsel for the defendant, (id. at 10-12), and her deposition testimony (id. at 6-9).

Along with the above three filings, also on May 29, 2012, Plaintiff filed two Notices (Docs. # 62 & 63) of Interlocutory Appeal regarding the court's discovery order - specifically the order regarding her deposition.[16]  These notices of appeal were transmitted to the Eleventh Circuit Court of Appeals on May 31, 2012, and divested the court of jurisdiction in this case until the appeal was resolved.

While the case was pending on "interlocutory appeal," the parties continued to file motions and documents with the court. First, on June 6, 2012, Defendant filed a Motion (Doc. #64) regarding the appeal and Objection to Plaintiff's additional answer to the court's order contained in her "Interlocutory Appeal." That same day,

---

[16] Plaintiff also used this filing as an "additional answer to the court's order." In essence, the additional answer is more argument by Plaintiff regarding her deposition testimony.

Defendant also filed a Motion (Doc. #65) to Strike Documents 60 and 61.  Then, on June 22, 2012, Plaintiff filed a document entitled "Response to the Defenses Introduction and Answer to Defense Commission of Perjury and Obstruction of Justice Plaintiffs Motions Against the Defense on All Front Have Been Reiterated." (Doc. # 67.)  The court did not address any of these orders as the case was on appeal.

On August 10, 2012, the Court of Appeals <u>sua</u> <u>sponte</u> dismissed the appeal for lack of jurisdiction.  (Doc. #70.)  Because Plaintiff was challenging the discovery rulings of the court, the Eleventh Circuit held that those rulings were not final or immediately appealable.  (<u>Id.</u>)  This court then regained jurisdiction to clean up the mess and "find a clear path to a resolution."  (Doc. #71.)  The court issued an order addressing all seven (7) pending motions and disposing of all of them but two dispositive motions - Defendant's Motion (Doc. #41) to Dismiss for Lack of Prosecution and Defendant's Motion (Doc. #56) for Summary Judgment.  (<u>Id.</u>)  In that order, the court again addressed the issue of Plaintiff's deposition and her purported changes, as many of her then-pending motions related to her objections to the court's order regarding her deposition testimony.  (Doc. #71 at 14-15.)  The court denied what it considered as Plaintiff's motion for reconsideration regarding her deposition testimony and changes throughout and made the following decision for her because of her failure to follow yet another court order: the court disallowed any

12

changes to her deposition testimony and found that the only admissible evidence before the court would be that to which Plaintiff testified in her original deposition. (Id. at 15.)

### B.  Current Motion for Summary Judgment

With that lengthy history, the court turns to the Motion (Doc. #56 ) for Summary Judgment filed by Defendant Burlington Coat Factory.  Both parties have filed briefs and submitted evidence in support of their respective positions. Defendant submitted a brief and evidence[17] (Doc. # 73) in support of its own Motion for Summary Judgment on September 14, 2012.  On October 24, 2012 and October 25, 2012, Plaintiff filed a brief and evidence[18] (Docs. # 76 & 77) in Opposition to Defendant's Motion for Summary Judgment.  On November 5, 2012, Defendant filed a brief (Doc. # 80) in reply to Plaintiff's opposition.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

---

[17] Defendant submitted the following evidence: deposition of Bridgette Burgin with exhibits 1-39.

[18] Plaintiff submitted Exhibits labeled 1-18 and supplemented her exhibits on October 25, 2012.  (Exh 1 to Docs. # 76 & 77.)

and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. See Celotex Corp., 477 U.S. at 323. After the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. See id. at 324.

The substantive law will identify which facts are material and which are irrelevant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. See id. at 249.

The method used by the party moving for summary judgment to discharge its

initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Prop., 941 F.2d 1428 (11th Cir. 1991) (en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement

that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

**III. Relevant Undisputed Facts**[19]

Before discussing the relevant, undisputed facts in this case, the court notes that Plaintiff did not present facts supported by citation to the record to the court in her brief (Doc. # 76) in opposition to summary judgment.  Instead, the entire 28 pages

---

[19]   These are the facts for summary judgment purposes only.  They may not be the actual facts.  See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts'") (citation omitted).  Where the facts are in dispute, they are stated in the manner most favorable to the plaintiff.  See Fitzpatrick, 2 F.3d at 1115.

are devoted to her argument, although she does use some alleged facts as part of her argument. Those "facts", however, do not contain any citation to the evidence before the court. It is not the job of the court to sort through Plaintiff's brief and evidentiary submissions to discover which facts are supported by the record, which are not, and which facts presented by Defendant that she disputes. Therefore, the court's recitation of the relevant, undisputed facts comes directly from the brief and properly cited evidence submitted by Defendant, which are amply supported by the record.

### A. Sales Associate in Women's Department and Shoe Department - May 2009 through April 2010

Plaintiff Bridgette Burgin, an African-American with a date of birth of September 10, 1959, began working as a part-time sales associate at a Burlington retail store in Birmingham, Alabama in May 2009. (Burgin Dep. at 112, 174-75, 178.) For the first six or seven months of her employment, Burgin worked as a sales associate in the women's department. (Burgin Dep. at 492.) Sometime toward the end of 2009, Burgin began working in the shoe department, because Burlington was trying to improve sales in that area. (Id. at 493.) Burgin worked in the shoe department until April 2010. (Id. at 456.)

As a sales associate, Burgin reported to Area/Department Manager Linda Joiner (Caucasian, date of birth 10/8/57), and to Assistant Store Manager of

17

Merchandise Marye Williams (African-American, date of birth 6/4/43).  (Burgin Dep.

at 188-189;  McKenzie Decl. at ¶¶ 4-5.)   Indirectly Burgin also reported to the

Assistant Store Manager of Operations Denise Rich (African-American, date of birth

4/19/61), and the Store Manager Ronda Fulton (Caucasian, date of birth 12/28/60).[20]

(Burgin Dep. at 189-190; McKenzie Decl., at ¶¶ 6-7.)

Burgin began having problems with her Department Manager, Linda Joiner,

a few months into her employment.  On August 2, 2009, Burgin complained to the

Assistant Store Manager Denise  Rich that Joiner was "disrespectful, unkind, and

astoundingly mean," and that Joiner had made racial comments on July 31, 2009.

(Burgin Dep. at 408-10, Exh. 32.)   Specifically, Burgin complained that she

overheard Joiner tell a customer that she needed "lighter" skinned employees "to get

things done right."[21] (Burgin Dep. at 411.)

A little over a month later, Burgin received her first disciplinary action.  On

---

[20]Burgin is younger than Joiner and Williams, and only one year older than Fulton.  (Id. at 472-74; McKenzie Dec., at ¶¶ 4-5, 7.)  Burgin testified that her age discrimination claim is based on her belief that Joiner, who she believes is a "sociopath," resented her for looking 10 years younger than she, despite the fact that they were approximately the same age.  (Burgin Dep. at 310-313.)

[21]Burgin testified that both Joiner and Fulton discriminated against her, though Burgin believes only that Fulton "allowed" discrimination against her, and did not actively discriminate herself.  (Burgin Dep. at 35-36, 478-79.)  Other than the statement Burgin contends she overheard Joiner make to a customer, Joiner never made any statements to Burgin about race.  (Id. at 428-29.)  In fact, Burgin testified that other than Joiner, no one at Burlington, including Fulton, ever said anything about race to Burgin.  (Id. at 350, 474-75.)

September 19, 2009, Burgin received an Employee Corrective Action Form, signed by Williams and Joiner, based on a customer's complaint about her alleged rude behavior.  (Burgin Dep. at 185-186, Def. Exh. 17.)  Specifically, the customer complained that Burgin was very rude when the customer  asked for assistance in the shoe department, and that while Burgin was walking away she stated that she worked with "jackasses" in front of the customer's child.  (Def. Exh. 17.)

A few months later, on November 13, 2009, Williams gave Burgin a one-page, eleven-point  "Action Plan" outlining her duties as a sales associate in the shoe department.  (Burgin Dep. at 217.)  This Action Plan was in response to a conversation between Williams and Burgin on October 23, 2009.  (See Def. Exh. 20.) The plan stated that Williams would follow up with Burgin in 30 days to assess her progress.  (Id.)  Burgin signed the Action Plan and wrote the following comment: "I agree with this if we, as promised, educate other PT workers to maintain the . . . [illegible] of the shoe department without which reprimand will be construed as cruel and unusual."  (Id.)

In further response to the "Action Plan", Burgin submitted to Williams a three-in-a half-page, single-spaced letter, in which she complained, among other things, that the Action Plan was "evidence of harassment, retaliation, and sabotage." (Burgin Dep. at 217,  222, 230, Def. Exh. 21.)  Discrimination, whether race or age-

based, was not mentioned.  (See id.)  Burgin testified at her deposition that she considered the Action Plan to be a form of "harassment," because it stopped her from doing her job as she saw fit, and was little more than "bringing [her] into the office, arguing or fussing or debating about issues [she] already underst[oo]d." (Burgin Dep. at 224.)  Burgin also testified at her deposition that she believed that the Action Plan was in retaliation for her on-going complaints that Williams and Joiner failed to properly direct, train, or help her do her job, and that in doing so, Williams and Joiner were sabotaging Burlington's sales production. (Id. at 228.)  Burgin felt Williams and Joiner treated her differently than employees who did not question their management skills when they criticized her performance.  (Id. at 230-31.)

Two months later, Burgin received three disciplinary actions in three days. Burgin received a second  Employee Corrective Action Form, on January 21, 2010, after a customer complained that Burgin had threatened to report that customer to child services.  (Burgin Dep. at 198, Exh. 18.)  The next day, on January 22, 2010, Burgin received a Final Written Warning for carelessness and negligence in performing her duties in the shoe department, signed by Williams.  (Burgin Dep. at 284-85, Exh. 26.)  Additionally, on the following day, January 23, 2010, Burgin was issued Notice of Corrective Action, also signed by Williams, for failure to follow through on assigned tasks.  (Burgin Dep. at 306, Exh. 27.)

About a week later, on February 2, 2010, Burgin received a third Notice of Corrective Action signed by Joiner and Williams, for dishonesty after she allegedly allowed a customer to purchase an item for half the price for which it was listed. Finally, Burgin received a formal Written Warning dated March 4, 2012, signed by Williams, for insubordination.  (Burgin Dep. at 203, 319, Exhs. 19, 29.)

Burgin also received informal performance counseling during her time in the women's department and shoe department.  Burgin was counseled informally through action plans, reminders, and task lists regarding her duties and responsibilities as a sales associate.  (See Burgin Dep. at 213, 242, 250-253, 256-57, 277-278, 314-316, Exhs. 20, 22, 23-25, 28.) Not including the ones specifically discussed above, Burgin was counseled on the following dates for performance-related issues: November 30, 2009 (Exh. 22), December 31, 2009 (Exh. 23), January 4, 2010 (Exh. 24), January 17, 2010 (Exh. 25), and February 28, 2010 (Exh. 28).   Williams authored these performance-related counselings. (See Burgin Dep. at 243, 253, Exhs. 20, 22, 23-25, 28.)

**B.  Sales Associate in Merchandising/Markdowns and Lingerie - April 2010 through November 16, 2011**

In April 2010, Burlington moved Burgin to a new position in merchandising/markdowns for one or two weeks.  (Burgin Dep. at 456.)   Burgin

testified that a younger employee named "Frankie" took over in the shoe department when Burgin was moved to merchandising/markdowns.  (Id. at 455-458.) After Burgin complained about being in merchandising/markdowns, Burlington again moved her to the lingerie department in approximately late April/early May 2010 where she remained until her resignation on November 16, 2011.  (Id. at 472.)

On May 11, 2010, Burgin received her 2009 Hourly Performance Evaluation covering her employment through January 30, 2010.  (Burgin Dep. at 335-36; Def. Exh. 30.)  Burgin received an overall rating of 2 out of 5, which represented  "does not meet expectations" on the performance scale. (Id.)  Burgin responded to the Annual Performance Review with a lengthy rebuttal in which she complained about retaliation by "management," for her "repeated complaints regarding behavior and attitudes."  (Burgin Dep. at 368; Def. Exh. 30.)  Burgin testified that she believed Fulton was retaliating against her for criticizing how the store was being managed. (Burgin Dep. at 369-372.)  Although the rebuttal mentioned nothing of race, age, or discrimination, Burgin testified at her deposition that she believed that the Annual Performance Review was discriminatory because a poor review equates with the perception that African-Americans are lazy, though the review itself does not contain any statement along those lines.  (Burgin Dep. at 343-44.)

On May 14, 2010,[22] Burgin filed her first Charge of Discrimination with the EEOC. (Def. Exh. 3.) In the charge, Burgin alleged discrimination on the basis of race and age and retaliation, during the time period from September 1, 2009 until March 22, 2010. (Id.) Burgin claimed to have been "subjected to disparate terms and conditions with respect to a hostile work environment," based on Joiner's alleged statements in July 2009. (Id.) She further alleged that she was retaliated against for complaining about Joiner's alleged statement when she was removed from the shoe department approximately eight months later, and a younger, white employee took over in that role. (Id.) Burgin also claimed that her hours had been reduced.[23] (Id.) Burgin received a Dismissal and Notice of Rights letter ("First Right to Sue Letter") relating to her First Charge, on or around November 30, 2010. (Burgin Dep. at 65; Def. Exh. 3.)

Burgin filed a second EEOC Charge on or around July 27, 2010. (Burgin Dep. at 68; Def. Exh. 5.) In it, Burgin alleged disability discrimination and retaliation for filing her First Charge. (Def. Exh. 5.) Burgin also alleged that her managers

---

[22] The court notes that Burgin signed the Charge on May 6, 2010, but it was date-stamped received on May 14, 2010. (Def. Exh. 3.)

[23] Although Burgin mentions an "off the job injury" and a "need for surgery" due to "a job that has aggravated the injury," she does not allege discrimination on the basis of a disability in her charge. (Def. Exh. 3.)

reviewed her performance excessively and failed to post her weekly schedule in a timely manner, and that she had been harassed by loss prevention,[24] all in retaliation for having filed the First Charge. (Id.) Burgin's Right to Sue Letter relating to her Second Charge is dated March 2, 2011, or about a week after Burgin filed her complaint in this court. (Burgin Dep. at 75, Exh. 5.)

In November 2010, Burgin contacted Burlington's corporate division to request a leave of absence for personal reasons. (Burgin Dep. at 383-84, 390, 499.) Burlington granted Burgin a personal leave of absence of ten weeks, beginning on November 16, 2010, and ending no later than January 25, 2011.[25] (Burgin Dep. at 387-88, Exh. 31.) Burgin understood that Burlington was not required to grant Burgin unpaid personal leave. (Burgin Dep. at 387.) She also understood that under the terms of her leave of absence, there was no guarantee that Burlington would

---

[24] As it relates to her claim of harassment by loss prevention, Burgin testified at her deposition that Benita Artis, African-American, of Burlington's loss prevention group, harassed her by following her around the store, and that on at least one occasion in August 2010, she and Artis were involved in a verbal altercation in the store. (Burgin Dep. at 435-36, 438, 440; Def. Exhs. 34-35.) Burgin testified that she overheard Joiner instruct Artis to keep an eye on Burgin, but that the alleged altercation was purely between herself and Artis. (Burgin Dep. at 438-39.)

[25] Williams, Joiner, and Fulton were not involved in Burgin's request for voluntary leave of absence, and played no role in Burlington's decision to grant Burgin a personal leave of absence. (Id. at 384.) Burgin took a personal leave of absence because she had been evicted from her residence, and had moved to Georgia to live with family. (Burgin Dep. at 137-38, 385-86.) Burgin also testified that she was having health problems at the time she took leave, but that she never informed Burlington of those health problems, her need for treatment, or any subsequent treatment that she may have received. (Burgin Dep. at 115-17, 385, 401.)

24

return Burgin to her position if she returned on or before the end of her leave. (Burgin Dep. at 393-395; Def. Exh. 31.) Moreover, Burgin was informed that if she did not return to work by January 25, 2011, her employment would be terminated. (Id.) Burlington also informed Burgin that while she could reapply for open positions at Burlington if she did not return by the end of her leave, she was not guaranteed future employment. (Id.)

Burgin did not return to her position with Burlington on or before January 25, 2011, and testified that she could not have returned to work on or before that date. (Burgin Dep. at 403.) She never formally requested her job back during her leave. (Burgin Dep. at 397-98.) Burgin did not communicate with Williams or Joiner during her leave. (Id. at 397, 406-08.) Instead she took her questions to Martine McKenzie, a Burlington HR Manager who Burgin believes interfered with her efforts to secure a position at a Burlington location in Georgia. (Id.)

Burgin filed her Complaint in this court on February 23, 2011, alleging Race and Age Discrimination (Count A), and Retaliation (Count B), under 42 U.S.C. § 2000 ("Title VII"), 42 U.S.C. § 1981 ("Section 1981"), and 29 U.S.C. § 621, the Age Discrimination in Employment Act ("ADEA"). (Compl.) The Complaint references the First Charge and the First Right to Sue Letter. (Compl. at ¶ 2.) At the time she

filed the Complaint, Burgin had not yet received the Second Right to Sue Letter, which is dated March 2, 2011. (Burgin Dep. Exh. 5.)  Burgin was represented by counsel in this matter until May 18, 2011. (Docket No. 7.)

## IV. DISCUSSION

Before delving into a discussion of the allegations made by Burgin, the court reminds the parties that plaintiff's pro se status does not entitle her to special treatment on summary judgment, nor does it exempt her from compliance with Rule 56 and the orders of this Court.  See, e.g., Albra v. Advan, Inc., 490 F.3d 826, 829 (11th Cir. 2007) (explaining that "we are to give liberal construction to the pleadings of pro se litigants," but that "we nevertheless have required them to conform to procedural rules") (citation omitted); Moon v. Newsome, 863 F.2d 835, 837 (11th Cir. 1989) (a pro se party "is subject to the relevant law and rules of court, including the Federal Rules of Civil Procedure," and may be sanctioned "for failure to comply with court orders").  Further, a court is not obligated to read minds or to construct arguments or theories that a party has failed to raise.[26]  See Resolution Trust Corp.

---

[26] See also Gleason v. Norwest Mortgage, Inc., 243 F.3d 130, 142 (3rd Cir. 2001) ("The ruling on a motion for summary judgment is to be made on the record the parties have actually presented, not on one potentially possible."); Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999) (declaring that a "party who aspires to oppose a summary judgment motion must spell out his arguments squarely and distinctly, or else forever hold his peace," as district court may ignore arguments not adequately developed by non-movant).

v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."). Clearly, "the onus is upon the parties to formulate arguments." Id. As such, Burgin's decision not to proffer argument, evidence or authority on many aspects of her claims in response to Defendant's Motion for Summary Judgment is at her peril. This court will not commit scarce judicial resources to ferreting out every possible contention plaintiff could have made, but chose not to make, in opposition to the Motion. See Case v. Eslinger, 555 F.3d 1317, 1329 (11th Cir. 2009) (noting that a litigant "cannot readily complain about the entry of a summary judgment order that did not consider an argument [she] chose not to develop for the district court at the time of the summary judgment motions") (citation omitted).

With that in mind, the court turns to the claims made by Burgin in her Complaint: (1) race and age discrimination "in the areas of termination, job/work assignments, hours of work, constructive discharge, and other adverse terms and conditions of employment" (Compl. ¶ 15); (2) retaliation after she complained about race and age discrimination, including the removal from the shoe department and her

alleged constructive discharge; (Compl. ¶¶ 18 & 19) and (3) hostile work environment (Compl. ¶ 8). As reiterated by the court on numerous occasions, her Complaint <u>does not</u> include a claim of disability discrimination (<u>see</u>, <u>e.g.</u> docs. # 42, 46) and the court did not consider any argument regarding disability discrimination. Although Burgin devotes much of her argument to her alleged disability, (see doc. # 76 at 1-3, 5-8, 11, 14, 17-19, 27, 28), any and all claims regarding her alleged disability is not before the court, and, therefore, irrelevant to the claims at hand.

## A. Race and Age Discrimination

As to her claims of race and age discrimination, Defendant's Motion for Summary Judgment is properly evaluated under the time-honored <u>McDonnell Douglas</u> standard. Absent direct evidence of discrimination (which Burgin has not presented), Burlington must make a showing of circumstantial evidence that satisfies the test set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this familiar burden-shifting analysis, plaintiff is required to make out a prima facie case of race discrimination. If she does so, that showing "creates a rebuttable presumption that the employer acted illegally." <u>Underwood v. Perry County Com'n</u>, 431 F.3d 788, 794 (11th Cir. 2005).

At that point, "the burden shifts to the employer to articulate some legitimate,

28

nondiscriminatory reason for the adverse employment action . . . . If the employer does this, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination." Crawford v. Carroll, 529 F.3d 961, 976 (11th Cir. 2008) (citations and internal quotation marks omitted). A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."     Brooks v. County Com'n of Jefferson County, Ala., 446 F.3d 1160, 1163 (11th Cir. 2006) (quotation omitted). Either way, "[i]f the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it . . . . Quarreling with that reason is not sufficient." Wilson v. B/E Aerospace, 376 F.3d 1079, 1088 (11th Cir. 2004); see also Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1278 (11th Cir. 2008) ("It is the plaintiff's burden not merely to raise a suspicion regarding an improper motive, but rather to demonstrate there is a genuine issue of material fact that the employer's proffered reason . . . was pretextual."). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Springer v. Convergys Customer Management Group Inc., 509 F.3d 1344, 1347 (11th Cir. 2007). Thus, "[i]f the plaintiff does not proffer sufficient evidence to create a genuine

29

issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment." <u>Chapman v. AI Transport</u>, 229 F.3d 1012, 1024–25 (11th Cir. 2000) (en banc).

### 1.   Burgin Has Not Made a Prima Facie Case of Race or Age Discrimination

To establish a prima facie case of disparate treatment under Title VII and the ADEA, a plaintiff must show that "(1) she belongs to a protected class; (2) she was qualified to do the job; (3) she was subjected to adverse employment action; and (4) her employer treated similarly situated employees outside her class more favorably." <u>Crawford</u>, 529 F.3d at 970; <u>see also</u> <u>McCann v. Tillman</u>, 526 F.3d 1370, 1373 (11th Cir. 2008) (similar).   Defendant does not dispute that Burgin is a member of a protected class by virtue of her race, African American, and her age, over forty. (Doc. #73 at 17.) Defendant also does not dispute, for purposes of summary judgment only, that Burgin was qualified for her position of part-time sales associate.   (<u>Id.</u>) Defendant does challenge the third and fourth elements: that she was subjected to an adverse employment action and that it treated similarly situated employees outside her class more favorably.  (<u>Id.</u>)

### a.  Adverse Employment Action Prong

An adverse employment action is an essential element of a claim of discrimination. Davis v. Town of Lake Park, 245 F.3d 1232, 1238 (11th Cir. 2001). "[T]o prove [an] adverse employment action . . . an employee must show a serious and material change in the terms, conditions, or privileges of employment." Id. at 1239 (quoted in Howard v. Walgreen Co., 605 F.3d 1239, 1245 (11th Cir. 2010)). "[T]he employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." Davis, 245 F.3d at 1239 (quoted in Howard, 605 F.3d at 1245.) Therefore, plaintiff must "establish an 'ultimate employment decision' or make some other showing of substantiality in the employment context in order to establish an adverse employment action." Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008)(citing, inter alia, Davis, 245 F.3d at 1239).

An "ultimate employment decision" is one "such as termination, failure to hire, or demotion." Id.  For a decision "falling short of an ultimate employment decision" to rise to the level of an actionable adverse employment, that decision "must, in some substantial way, alter the employee's compensation, terms, conditions, or privileges

31

of employment, deprive him or her of employment opportunities, or adversely affect his or her status as an employee." Id. (internal quotations and citation omitted). Among the facts and circumstances affecting whether a decision is considered "adverse" are whether the decision results in "lesser pay, responsibilities or prestige," and whether the decision would "impede an employee's professional growth or advancement." Doe v. DeKalb County School District, 145 F.3d 1441, 1452 (11th Cir.1998). "Although proof of direct economic consequences is not required in all cases, the asserted impact 'cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment.'" Soloski v. Adams, 600 F.Supp.2d 1276, 1356 (N.D.Ga. 2009) (quoting Filius v. Potter, 176 Fed. Appx. 8, 10 (11th Cir. 2006))(unpublished).  "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." Smart v. Ball State University, 89 F.3d 437, 441 (7th Cir. 1996)(internal quotations and citations omitted).

Burgin does not make any specific argument as to what she alleges as her adverse actions.  Although the court will not make her argument for her, after reading

her brief, she does attempt to make some argument that she was treated differently and/or discriminated against in the following ways: (1) discipline and performance-related coaching and reviews; (2) movement out of the shoe department, an alleged demotion according to Burgin; (3) the assignment of hours to work; and (4) her alleged constructive discharge and/or termination. None of these alleged actions rise to the level of an actionable adverse employment action for the following reasons.

None of the disciplines, performance-related coachings, or reviews were adverse employment actions because there is no admissible evidence that any of them affected the terms, conditions, or privileges of her employment. See Clark v. Potter, 232 Fed. Appx. 895, 897 (11th Cir. 2007)(letter of warning that had no effect on the plaintiff's employment was not an adverse employment action); Austin v. City of Montgomery, 196 Fed. Appx. 747, 753 (11th Cir. 2006)(counseling memos not adverse employment actions; plaintiff failed to show that memos were "a formal reprimand or triggered any tangible form of adverse action such as loss in benefits, ineligibility for promotional opportunities, or more formal discipline"); Summerlin v. M & H Valve Co., 167 Fed. Appx. 93, 97 (11th Cir. 2006)(a reprimand that does not "have an impact on an important condition of employment, such as salary, title, position, or job duties," is not an adverse employment action); Braswell v. Allen, 586

33

F.Supp.2d 1297, 1306 (M.D.Ala. 2008)("A reprimand does not constitute an adverse employment action when the employee suffers no tangible harm as a result.") (citations omitted).

Second, although Burgin contends that her work hours changed and/or were reduced during her employment because of her race and/or her age, there is absolutely no evidence in the record before the court to support this allegation. Although Burgin submitted four (4) unverified documents allegedly showing her work hours on four (4) different weeks while she was working at Burlington, (Doc. #76 at 52-56 ), these documents alone do not support her contention that her hours were reduced in general. Instead, they show one week, while Burgin was in Markdown, where her hours were allegedly reduced.[27]   Burgin only worked in this department for one or two weeks. (Burgin Dep. at 456), and was moved to the lingerie department as soon as she complained. (Id. at 472.)   The court has no information about Burgin's hours when she moved to the merchandising/lingerie department.   (Id.)

Third, Burgin's move from part-time sales associate in the shoe department from part-time sales associate in merchandising and lingerie was not an adverse employment action. Although Burgin characterizes the move as a "demotion," there

---

[27] These documents, entitled "Schedule Report" do not contain any marks of reliability, and the court would be hard-pressed to rely on them as admissible evidence in this case.

is no evidence before the court that the move caused any change in her status at Burlington; nor is there any evidence that the move in departments  affected the terms, conditions, or privileges of her employment.  See Melton v. Nat'l Dairy LLC, 705 F. Supp. 2d 1303, 1329 (M.D. Ala. 2010) (changes in work assignments, absent more, do not constitute adverse employment actions).

Finally, the evidence before the court does not support Burgin's contention that she was constructively discharged.  "A constructive discharge occurs when a discriminatory employee imposes working conditions that are 'so intolerable that a reasonable person in [the employee's] position would have been compelled to resign.'" Fitz v. Pugmire Lincoln–Mercury, Inc., 348 F.3d 974, 977 (11th Cir. 2003) (citing Poole v. Country Club of Columbus, Inc., 129 F.3d 551, 553 (11th Cir. 1997)). The Eleventh Circuit uses an objective standard to evaluate constructive discharge claims. Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1231 (11th Cir. 2001) (citing Doe v. Dekalb Cnty. Sch. Dist., 145 F.3d 1441, 1450 (11th Cir.1998)).  The standard for proving constructive discharge is higher than that for a hostile work environment.  Id.; see Barrow v. Ga. Pacific Corp., 144 Fed.Appx. 54, 59 (11th Cir.2005) (a plaintiff cannot meet the standards for a constructive discharge claim if he cannot establish a hostile work environment claim). The court must find that

"pervasive conduct by employers" occurred prior to finding that a constructive discharge occurred. Hipp, 252 F.3d at 1231. Moreover, "[p]art of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast." Garner v. Wal–Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir.1987) (finding that it would have been reasonable for the employee to complain about her position to her manager rather than quit after one day of being in an uncomfortable position).

In this case, there is no evidence to support a constructive discharge. Instead, the evidence before the court is that Burgin voluntarily left Burlington for personal reasons and did not return to her position by the end of her leave of absence. (Burgin Dep. at 137-38, 385-86, 397-98, 406-08.) More specifically, the undisputed evidence is that Burgin contacted Burlington's corporate division to request a leave of absence for personal reasons in November 2010, and Burlington granted Burgin a personal leave of absence of ten weeks, beginning on November 16, 2010, and ending no later than January 25, 2011. (Burgin Dep. at 303-84, 387-88, Exh. 31.) Burgin testified that she understood that Burlington was not required to grant Burgin unpaid personal leave and that under the terms of the leave of absence, there was no guarantee that Burlington would return Burgin to her position if she returned on or before the end

36

of her leave.  (Burgin Dep. at 387, 393-395; Def. Exh. 31.)  Moreover, Burgin was informed that if she did not return to work by January 25, 2011, her employment would be terminated and that while she could reapply for open positions at Burlington if she did not return by the end of her leave, she was not guaranteed future employment.  (Id.) Burgin did not return to her position with Burlington on or before January 25, 2011, and even testified that she could not have returned to work on or before that date.  (Burgin Dep. at 403.)

Moreover, there is no evidence before the court, other than her own unsupported speculative beliefs, that Fulton, Joiner and Williams had some sort of plot to "get rid" of Burgin.  "[M]ere suspicion of an unsubstantiated plot is not an intolerable working condition" sufficient to establish a constructive discharge. Foshee v. Ascension Health-is, Inc., 384 Fed. Appx. 890, 892 (11th Cir. 2010).  In addition, as discussed in detail below, Burgin cannot establish the existence of a hostile work environment as a matter of law, and the standard for establishing a claim for constructive discharge is higher than the standard for hostile work environment. Hipp, 252 F.3d at 1231.

For the above reasons, Burgin has failed to establish the third prong of her prima facie case - an adverse employment action.  As such, summary judgment is

proper as to her claims of race and age discrimination.

### b.  Similarly Situated Employee Prong

Even if she had established an adverse employment action, she did not present sufficient evidence to support the fourth prong of her prima facie case.  As to the fourth element, "[a] plaintiff does not shift the burden to the defendant under McDonnell Douglas merely by stating that [s]he was fired or treated unfavorably. McDonnell Douglas requires the plaintiff to establish a prima facie case which includes identifying an individual who replaced him or was treated better than he was who was not a member of his protected class."   Morris v. Emory Clinic, Inc., 402 F.3d 1076, 1082 (11th Cir. 2005).  To satisfy this "similarly situated" threshold, "[t]he comparators for the fourth prong must be similarly situated in all relevant respects." Brown v. Alabama Dep't of Transp., 597 F.3d 1160, 1174 (11th Cir. 2010).  The comparator must be nearly identical to the plaintiff to prevent the  court from second-guessing a  reasonable decision by the employer.  See Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1259 (11th Cir. 2001).

Burgin does not identify any potential comparators as it relates to her claim of race discrimination.  As for her claim of age discrimination, Burgin testified that a younger employee named "Frankie" took over in the shoe department when Burgin

38

was moved to merchandising/markdowns.  (Id. at 455-458.)  She also argues that an employee named Shenelle replaced her in the shoe department.  (Doc. #76 at 15.)  Finally, Burgin references Tiffany Reid (Doc. #76 at 11, 24) when discussing "younger employees" but does not give any specific information as to this individual.

Other than their names and their alleged ages, the court has no further information about these three individuals.  The mere fact that Burgin contends that two younger employees replaced her in the shoe department is insufficient to establish the similarly situated prong of the prima facie case.  The court has no other information regarding these individuals by which to compare them to Burgin.  For instance, the court does not know the positions where these individuals worked, their duties and responsibilities, or their work experience.  Without such information, the court would be merely second guessing the decision made by Burlington, something that the Eleventh Circuit has warned against doing.  See Silvera, 244 F.3d at 1259.  As for Tiffany Reid, the court has no information about her sufficient to establish her as a suitable comparator.  Therefore, Burgin failed to present evidence to satisfy the fourth element of her prima facie case.[28]

---

[28]The court is aware that the failure to prove this final element of the prima facie case is not necessarily fatal to a plaintiff's claim: "[i]f a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present."  Holifield, 115 F.3d at 1562 (internal citation omitted).  However, as explained, Burgin has failed to show any evidence of discrimination with regard to her

In conclusion, Burgin has failed to establish a prima facie case of discrimination as to her race and/or her age. She has failed to establish that she was subjected to an adverse employment action while she worked at Burlington. Even if she had established this element, she failed to establish a suitable comparator. As such, summary judgment is proper as to Burgin's claims of race and age discrimination.

## 2. Burgin Has Submitted No Evidence of Pretext

Even if Burgin had made out a prima facie case of race and age discrimination (which she has not), Defendant's Motion for Summary Judgment would be properly granted as to these claims because she has failed to come forth with sufficient evidence to establish pretext. As explained above, Burgin may establish pretext in one of two ways: (1) "either directly by persuading the court that a discriminatory reason more likely motivated the employer" or (2) "indirectly by showing that the employer's proffered explanation is unworthy of credence." Brooks., 446 F.3d at 1163 (quotation omitted). Either way, "[i]f the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it . . . . Quarreling with that reason is not sufficient." Wilson, 376

---

employment at Burlington.

F.3d at 1088; see also Rioux, 520 F.3d at 1278.

Here, Burgin has done nothing more than disagree with decisions made by Burlington, including how it managed its store and evaluated her performance. She does not make any argument whatsoever creating a genuine issue of material fact that the decisions made during her employment with Burlington were motivated because of race and/or age.[29] Instead, her testimony and argument merely establishes a personality conflict between Burgin and her superiors. Federal law does not protect employees from personality conflicts with other employees or their superiors. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Springer v. Convergys Customer Management Group Inc., 509 F.3d 1344, 1347 (11th Cir. 2007). Burgin has completely failed in this regard. As such, she has not established pretext in regards to her discrimination claims, and summary judgment is proper as to both claims under Title VII and the ADEA.

---

[29] The one comment attributed to Joiner about "white" or "lighter" employees in August 2009 was an isolated comment that unrelated to any challenged employment decision. As such, it is insufficient to establish pretext. See Ritchie v. Indus. Steel, Inc., 426 Fed. Appx. 867, 872-73 (11th Cir. 2011); English v. CSA Equip. Co., 2006 WL 2456030 at *17 (S.D. Ala. Aug. 22, 2006).

**B.  Hostile Work Environment**

To establish a hostile work environment claim under Title VII and the ADEA, the plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367 (1993); Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).  The requirement that the harassment be "severe or pervasive" contains an objective and a subjective component. Miller, 277 F.3d at 1276. "Thus, to be actionable, this behavior must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceive[s] ... to be abusive."  Id. (internal quotation marks omitted).  In evaluating the objective severity of the harassment, this court looks at the totality of the circumstances and considers, among other things: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Id. "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." Harris, 510 U.S. at 23, 114

42

S.Ct. 367.  Discrete acts cannot alone form the basis of a hostile work environment claim. See Davis v. Coca–Cola Bottling Co. Consol., 516 F.3d 955, 970 (11th Cir. 2008).  Instead, a hostile work environment claim addresses acts that are "different in kind" and whose "very nature involves repeated conduct," such as "'discriminatory intimidation, ridicule, and insult.'"  McCann v. Tillman, 526 F.3d 1370, 1378 (11th Cir. 2008) (quoting Nat'l R.R. Passenger Corp., 536 U.S. at 117, 122 S.Ct. 2061)).

Burgin makes the following arguments in regard to her hostile work environment claim:

- Burgin contends she  "suffer[ed] deep, mental, emotional, and psychological humiliation, making Burgin feel embarrassed often in front of customers and co-workers" from actions by Joiner and Williams (Doc. #76 at 5);

- Burgin stated that she experienced "constant 'nitpicking'" by Williams and Joiner. (Id.);

- Burgin "informed her managers of Bonita Artis . . . of assaulting Plaintiff.  Burgin also filed a Police Report . . . against Artis.  Burgin stated to managers and to the police that Burgin was stressed due to the hostile environment, and felt unsafe in the environment.  Burgin also stated that she felt her environment was 'perverse' as Ms. Artis often fondled the women's lingerie in a sexual nature while in Burgin's presence.  Burgin voiced severe discomfort, uneasy, and distressed emotions, and the Plaintiff felt as if she were in a hostile environment." (Id. at 6.)

- "[V]erbal attacks by Williams, Joiner, and the verbal and physical attacks by Bonita Artis were intimidating, and hostile, which affected Burgin's ability to perform her job."  (Id.)

43

- "Linda Joiner and Bonita Artis used aggressive and unreasonable behavior against Burgin, when Joiner was overheard by Burgin, saying to Artis to follow Burgin, and 'watch her, she steals.' Artis took this directive one step further by pushing, grabbing, and shoving Burgin. Artis was seen by others workers yanking and twisting Burgin's injured wrist, while slamming down Burgin's arch with the heel of her foot." (Id. at 7.)

None of these allegations (and the other ones mentioned in her brief but not highlighted above) come close to establishing the requirements necessary to sustain a claim for hostile work environment based on race and/or age. In fact, none of her allegations contain any reference whatsoever to Burgin's race or age. Instead, Burgin's complaints of alleged ridicule and humiliation seem to stem from personality conflicts and general dislike between her managers, co-workers and herself. Neither Title VII nor the ADEA is not a federal "civility code." Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75 (1998). Burgin's hostile work environment argument is based on her subjective perception and speculation, rather than on specific facts from which a reasonable jury could find that she was subjected to a discriminatorily hostile work environment because of her race and/or her age. It therefore, fails as a matter of law, and Burlington is entitled to summary judgment on Burgin's hostile work environment claim.

44

## C.  Retaliation

Title VII prohibits employers from retaliating against an employee "because [s]he has opposed any ... unlawful employment practice ... or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a).  To establish a prima facie case of retaliation, the plaintiff must show that (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse employment action; and (3) there was a causal link between the two.  Dixon v. The Hallmark Companies, Inc., 627 F.3d 849, 856 (11th Cir. 2010).   If the plaintiff is able to advance a prima facie case of retaliation, the burden then shifts in accordance with McDonnell Douglas to USS to articulate legitimate, non-discriminatory reasons for the alleged retaliatory acts.  See Phillips v. Aaron Rents, Inc., 262 Fed. Appx. 202, 2008 WL 111038, No. 07-11477 at *8 (11th Cir. Jan. 11, 2008) ("Retaliation claims are also analyzed under the McDonnell Douglas burden-shifting framework.") (citing Holifield, 115 F.3d at 1566).   Once her employer articulates such a reason, the plaintiff must demonstrate that her employer's proffered explanation is a pretext for retaliation for her claim to survive summary judgment.  See id.

Burgin engaged in a protected activity when she complained to Rich about

45

Joiner's alleged comments.  For the purposes of summary judgment only, the court will assume, without deciding that Burgin can establish a prima facie case of retaliation as it relates to her transfer from the shoe department and her performance reviews, counselings and warnings.

   Even with that assumption, Burgin cannot demonstrate that Burlington's legitimate, nonretaliatory reasons for the asserted actions were a pretext for retaliation.     Burlington states that it transferred Burgin out of the shoe department because of her "well-documented poor performance in the shoe department."  ( Doc. # 73 at 26.)  As for her performance reviews, counselings and warnings, Burlington articulated specific reasons for each one - all of which are legitimate business reasons for giving a counseling or a warning to an employee.  See infra, Section III. A & B.

   Burgin's argument in support of pretext is the timing of her performance reviews and warnings, which began about a month after she made her complaint to Rich about her Department Manager, Joiner.  Those performance evaluations led to her alleged demotion out of the shoe department.  She contends (without any citation to the record) that Rich shared the complaint with Joiner and Williams.[30]  (Doc. # 76 at 10.)  She then argues that the Assistant Store Manager of Merchandise, Williams,

---

   [30] Other than this unsubstantiated remark in her brief to the court, there is no evidence to support this contention.

began writing her up only after she reported that Joiner was "disrespectful, unkind, and astoundingly mean," and that she overheard Joiner tell a customer that she needed "lighter" skinned employees "to get things done right." (Id.; Burgin Dep. at 408-11; Exh. 32.)

Timing alone is insufficient to establish pretext and that is especially true based on the facts presented in this case. Here, Burgin made a complaint against Joiner on August 2, 2009, and about a month later, on September 19, 2009, she received her first Employee Corrective Action Form. This Corrective Action Form, however, was based on a customer complaint about Burgin's alleged rude behavior to that customer, and not based upon Williams or Joiner's opinions of Burgin and/or her performance. Burgin does not contest that the event took place or that the complaint was somehow fabricated by Williams. The next alleged "counseling" did not occur until November 13, 2009, over four months after her complaint. Moreover, this "counseling" was actually not a counseling or warning at all, but simply an Action Plan detailing the expectations for Burgin in the shoe department. The true performance counselings and warnings did not begin until November 30, 2009 and continued on a regular basis until she was transferred out of the shoe department.

Burgin asks the court to infer from the timing of these actions that Williams

47

was motivated by retaliatory intent.  The court cannot accept this argument in the absence of additional facts to support retaliatory intent.  If timing alone were sufficient, any employer who received a complaint protected under one of the retaliation provisions would thereafter have its hands tied regarding any discipline of the employee.  Title VII and the ADEA are not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking. Here, the evidence of Burgin's poor performance is well-documented and Burgin has not introduced any evidence, other than her unsubstantiated beliefs, that she was retaliated against because of her race or because of her age.  As such, summary judgment is proper as to Burgin's claims of retaliation.

## V.  Conclusion

In summary, Burlington's Motion (Doc. # 56) for Summary Judgment is due to be granted in full.  As a result of this conclusion, Burlington's pending Motion (Docs. # 41) To Dismiss for Lack of Prosecution[31] is **MOOT**.  The court will enter

---

[31] The court could have easily dismissed this case because of Burgin's blatant disregard of the court's orders.   District courts possess the inherent power to sanction errant litigants before them.  See Martin v. Automobili Lamborghini Exclusive, Inc., 307 F.3d 1332, 1335 (11th Cir. 2002) ("Courts have the inherent authority to control the proceedings before them, which includes the authority to impose "reasonable and appropriate" sanctions.").  Indeed Federal Rule of Civil Procedure 41(b) expressly "authorizes a district court to dismiss a complaint for failure to prosecute or failure to comply with a court order or the federal rules."  Gratton v. Great American Communications, 178 F.3d 1373, 1374 (11th Cir. 1999).  While "[p]ro se pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be

a separate, final order dismissing the instant action with prejudice.

**DONE** this the  4th  day of June, 2013.

_[signature: James H. Hancock]_

_____

SENIOR UNITED STATES DISTRICT JUDGE

_____

liberally construed[,]" Tannenbaum v. United States, 148 F.3d 1262, 1263 (11th Cir. 1998), this does not extend to a *pro se* litigant's failure to comply with federal procedural rules, local court rules, or orders of the court.  See Ingram v. Alabama State Univ., 2006 WL 3791975, *1 (S.D. Ala. Dec. 21, 2006); Brown v. Tallahassee Police Dept, 2006 WL 3307444, *1 (11th Cir. Nov. 15, 2006).

Notwithstanding the availability of such a sanction in the arsenal of every district court, the Eleventh Circuit has held that dismissal of an action for failure to prosecute should be undertaken only as a last resort, when lesser sanctions would be inappropriate, and "only in the face of a clear record of delay or contumacious conduct by the plaintiff."  McKelvey, 789 F.2d 1518, 1520 (11th Cir. 1986); see also Goforth, 766 F.2d at 1535 (dismissal for failure to prosecute is appropriate where the record reflects a "clear record of delay or willful contempt" on the part of a litigant). "In determining whether a Rule 41(b) dismissal for failure to prosecute or failure to comply with court orders is appropriate, courts have considered such factors as (1) the culpability of the plaintiff; (2) the degree of prejudice to the defendant; (3) whether the plaintiff has a history of deliberately proceeding in a dilatory fashion; and (4) the efficacy of less drastic sanctions."  Hudson v. Cardwell Corp., 2006 WL 2135791, *2 (S.D. Ala. July 26, 2006) (citations omitted).  Contumacious conduct warranting dismissal for failure to prosecute includes such activities as "protracted foot-dragging," "defiance of court orders," "ignoring warnings," and "wasteful expenditure of the court's time."  Chamorro v. Puerto Rican Cars, Inc., 304 F.3d 1, 4-5 (1st Cir. 2002); see also Jones, 709 F.2d at 1462 (affirming dismissal for failure to prosecute where plaintiff disregarded multiple court orders directing him to respond within a certain time). Violations "caused by simple negligence, misunderstanding, or inability to comply", however, do not constitute "willfulness." In re Se. Banking Corp., 204 F.3d 1322, 1332 (11th Cir. 2000); McKelvey, 789 F.2d at 1520 (simple negligence does not warrant dismissal).

As set out in detail in the background section of this memorandum opinion, see infra Section I.A,  Plaintiff has utterly failed, despite repeated warning from this court, to comply with court orders and imposed deadlines, and has failed to proffer any explanation or good cause for same.   Accordingly, the court finds that due to Plaintiff's repeated failure to comply with court orders and to prosecute this action, and upon consideration of the alternatives that are available to this court, Plaintiff's action is due to be dismissed with prejudice pursuant to Rule 41(b) of the Federal Rules of Civil Procedure as no other lesser sanction will suffice. See, e.g., Zocaras v. Castro, 465 F.3d 479 (11th Cir. 2006); Norman v. Montgomery Bd. of Educ., 177 Fed. Appx. 939 (11th Cir. 2006) (unpublished); Brown, 2006 WL 3307444; Gratton, 178 F.3d at 1374; Goforth, 766 F.2d at 1535.